## ESTATE OF THOMAS SHEEHAN, DECEASED.

APPEAL BY JULIA MARY MITCHELL FROM THE ORPHANS' COURT OF ALLEGHENY COUNTY.

Argued November 3, 1890—Decided January 5, 1891.
[To be reported.]

1. In the distribution of a decedent's estate, though the evidence as to the right of a claimant to participate may be such as to authorize an issue, yet, where none is demanded and the parties prefer the decision of the court upon the facts, the finding of the court must be given the same effect as the verdict of a jury.
(a) The evidence of a claimant, as to her identity as an heir at law of the decedent, was circumstantial merely, relating to three subjects, to wit, early recollections of the claimant, family resemblance, and a birthmark, and was met by the direct evidence of a witness examined before the court filing the adjudication :
2. The burden of proof being upon the claimant, and the evidence before the Orphans' Court being fully sufficient to submit to a jury and to sustain a verdict against the claim made, the finding of the court against the right of the claimant to participate as an heir at law, would not be disturbed.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 148 October Term 1890, Sup. Ct.; court below, No. 167 December Term 1888, O. C.

Adjudication.

On December 14, 1888, the first and final account of Ann Sheehan, administratrix of the estate of Thomas Sheehan, deceased, showing a balance of $2,178.26 due the estate, was confirmed absolutely, no exceptions being filed. An audit for distribution was held on April 29, 1889, when Julia Mary Mitchell claimed the whole of the fund, subject to the interest of Ann Sheehan, widow of the intestate. Her claim to share in the distribution at all, however, was resisted by the collateral heirs.

After argument upon the facts claimed to have been shown by the testimony heard, the court, HAWKINS, P. J., filed the following adjudication :

Thomas Sheehan died September 21, 1887, intestate, leaving an estate valued at $20,000. Part of this estate is now ready for distribution. Claims therefor have been presented on behalf of Ann Sheehan, as widow, and Julia Mary Mitchell, as only child; and these claims are disputed by collateral relatives of decedent. The questions thus raised require a somewhat detailed résumé of the evidence adduced.

In 1852, William Beat, a small farmer residing in Hampton township, died, leaving a widow, Ann Beat, and minor children. The widow and children continued in occupation of the farm for some years, and employed Thomas Sheehan as farm hand. On October 6, 1855, the widow gave birth to an illegitimate daughter, of whom Sheehan was the father, and nine days thereafter, at the instance of Sheehan, and probably with a view to concealment of her shame, gave the child in charge of Sheehan's sister, Mrs. Margaret Gibbons. The Gibbons family then resided in Saltsburg, and consisted of (1) Garrett Gibbons ; his wife (2) Margaret Sheehan ; his father (3) Michael, whose nose had been eaten off by cancer ; his (4) sister ; and his son (5) Michael, aged three months. They moved to Pittsburgh in the spring of 1856 ; from thence to Birmingham, and in 1857, probably in the fall, to Keokuk, Iowa, taking Sheehan's daughter with them. Mrs. Beat, the widow, did not see her child after she had placed it in charge of Mrs. Gibbons while it remained in this county ; and it does not appear Sheehan saw it. They do not seem to have had any correspondence with the Gibbons family after its departure for Keokuk.

Adjudication.

In 1859, Mrs. Beat and Sheehan married and thereafter lived together as husband and wife. It was probably about the date of this marriage that one Driscoll, who resided in Keokuk and knew the Gibbons family there, reported the death of Mrs. Gibbons; and that shortly afterward Sheehan went west in search of information of his daughter. On Sheehan's return he reported to his wife that he had failed to find the child; to his cousin, Amelia Corbett, with whom he was very intimate, he said he had gone to "Keokuk, all around there;" that "he didn't leave an asylum or an orphans' home, nor anywhere he thought she would be, that he didn't look for her, and he couldn't get her, and he came home without her." In 1864, he again went in search of her, and again failed to find her. He did, however, find Michael, son of Garrett Gibbons, in an asylum in St. Louis, and brought him home with him. In the spring of 1865, he joined Company B, Second Pennsylvania Cavalry, and went to the war. At the close of the war he seems to have made another search, and on his return said to Amelia Corbett that his daughter was dead, and he had stood at her grave in Keokuk. On another occasion, when his cousin, Margaret Corbett, said to him, "he ought to look for his girl now, may be he could find her and bring her home," he replied, "No, she is dead."

He always, however, seems to have led his wife to believe that there were still hopes, and on his death-bed exacted a promise from her that she would continue the search, although he had himself made no further effort since shortly after the close of the rebellion. His wife had never given up hope of recovering her child; and this hope was apparently strengthened by a dream which she had that her child was living and sewing in a tailoring establishment, and by an incident which occurred in July, 1865, while her husband was still in the army. The following is her account of this incident:

"I stood in the market house sometimes four days in the week; sometimes not so many. One Saturday morning in 1865, there was a lady came to me in market, about 5 o'clock in the morning. She had a little girl with her; and when she got to the end of some short benches in the market house, she turned the girl around and said, 'Wait there.' Then she walked forward to me and asked if I was Mrs. Thomas Shee-

Adjudication.

han ? I told her I was. She asked me if Mr. Sheehan was home from the army? I told her no, but that he would be home in a couple of weeks from that date; it might be the 22d or 23d of July, as near as I could think. The lady was very well dressed, and the little girl was dressed in furs; she had on gray or squirrel furs, light; and what made me take more notice to the child than I would otherwise have done was her wearing furs in July. But the lady herself was very well dressed. She wore a very handsome silk shawl, gay colors, a light ground, and a good deal of red and green flowers in it, and a very deep silk fringe border. She appeared to be in a study ; she put her hand up to her face, and I said to her, 'Have you any news for Mr. Sheehan?' and she said, 'Well, not now ;' and she just turned around and walked away, and said to the little girl, 'Come.' Well, I thought she was a Pittsburgh lady ; I thought I had seen her in Pittsburgh, but I must, perhaps, have been mistaken. I was not satisfied. I went three times to Pittsburgh afterward with a load of produce for the market, thinking, perhaps, I would meet with her somewhere, but I never saw the woman again. After she went away I felt satisfied that she really must have had our child with her ; that that had been her errand. Mr. Sheehan had been searching for her, and not finding her, I thought she had found it out and come on with the child. . . . . She didn't tell me her name, but I thought she had something on her mind more than what she spoke."

The fact of the birth of a child to Widow Beat was known to few persons during the lifetime of Sheehan.

Within two or three weeks afterwards, Mrs Sheehan told several of her friends of the fact; of her belief in the child's continued existence, and of a birthmark by which she thought she could identify it. This birthmark she described as being brown, two and one half inches in length by two inches in width, and located above and to the right of the navel; and she said that she attributed this mark to a fright which she had received, whilst working in the garden, just before the birth of the child, from a frog.

The story of the lost heir was published in the Pittsburgh Commercial Gazette and there read by the present claimant, then residing in New Castle, Lawrence county, Pa., and known

Adjudication.

by the name of Julia Mary Mitchell. Miss Mitchell called on Mrs Sheehan in November, 1887, claimed to be the lost heir, submitted her proofs, and returned to New Castle; and Mrs. Sheehan, having subsequently satisfied herself of the identity of the claimant, sent for her in December, received and recognized her as her daughter, and the two have since continued to live together in that relation.

The story told by this claimant is substantially as follows: Her earliest recollection was when she was a very small child, perhaps four or five (certainly over four) years of age. She resided some place out west, could not state definitely just where. The family in which she lived consisted of a lady whom she called mother, a small boy, called Tommy, an old gentleman, "Daddy Gibbons," who had no nose, and a younger one whose name she did not recall. From this family she was transferred to another named Kerwin, where she remained two weeks and then returned to the Gibbons family, who in the meantime had removed to a town which they said was Leavenworth, Kansas. There was, when she returned, one more in the family, a larger boy, who was called Willie; and often there came to the house a girl who was called Mary. The story then proceeds in the language of the claimant thus:

"One day this lady that I called mother . . . . . took this older boy with her. The little fellow was left with me, or we were left together, rather. She took a basket and started out. She hadn't been gone very long, and we went out and were sitting on the step in the door. . . . . It wasn't a wide street, but it was cobble, I think. . . . . We were sitting on the step, . . . . . when I noticed coming up the street two men, one a very tall one, and the other a smaller one. The large man had on a gray coat and a dark hat. He came up to me. Just before he came up, the corner of his coat, it was a middling long coat, blew back by the breeze some way, and I noticed that the coat was lined with red. Then he came up to me and said, 'Sissy, would you like to have some candy?' I replied I would. He says, 'Come with me and I will get you some.' I arose to go with him, taking the little fellow by the hand; but he says, 'You must leave the boy here and you can fetch him the candy;' so I hesitated; I wanted to take him along with me, but he says, 'No; leave him and bring him the

Adjudication.

candy.' So I started off with him. He didn't take me by the hand; he told me to follow him. I had no shoes or stockings on. I had nothing on my head when I started off with him. I followed these two men quite a distance; and when I had followed them quite a distance, I noticed that the smaller man of the two had disappeared; but I hadn't seen where he had gone. Then I followed on after the taller one until I was very tired; and at last I began to whimper and cry, and he took me by the hand and led me along quite a distance. We came to a place where the stairs went up a hill, the stairs were in the hillside; quite a number of stairs; and he picked me up and carried me up these stairs into a house, and gave me to a lady that I suppose was his wife."

The tall man was known as Andrew Harrison, and the lady as his wife, and seem to have been connected with a strolling company of players. They seem to have given the little girl the name of Julia Harrison and treated her as their own; and she to have accepted the situation as a matter of course. By what name the girl was called, while in the family in which she first lived, does not appear. She mentions as having been known as Kerwin; but not as Sheehan, nor Gibbons. "Mary" was not added to her name until some years afterwards.

About three days after Julia was thus adopted, she heard Mr. Harrison say to his wife, " I gave Garrett ten dollars ; " to which his wife responded, " That will bring us in many a dollar." The Harrisons remained at Leavenworth about one week ; and from thence traveled from place to place, acting with their company. Julia remembers that they passed through " Springfield ; " and about a year after her adoption arrived at Rolla (probably in Missouri), where they left her in charge of a friend whose name was McCreary or McCleary, and thenceforth they disappeared from her view. McCreary took her thence to St. Louis, where he placed her in a Catholic orphan asylum. No evidence has been adduced showing in what asylum she was entered, nor in what name, nor even that search had been made for evidence in corroboration of claimant's story. The asylum was large, and in all probability its records were carefully kept, and are readily accessible.

She seems to have been taken out of the asylum by a Mrs. Mitchell of St. Louis to act as nurse, about a year after her

Adjudication.

entry; and continued in that situation until July, 1865, when she was taken by Mrs. Mitchell to New Castle, Pa., via Pittsburgh. They stopped over night at Pittsburgh, and early next morning, according to claimant's story, after Mrs. Mitchell had washed and dressed her, they went to the market house. With the exception of the conversation, which she did not hear, Julia's account of what took place there, and of the manner in which she and Mrs Mitchell were dressed was substantially the same as that given by Mrs. Sheehan; and there seems no reason to doubt that she has stated the facts of that incident. Julia states that she had often heard Mr. and Mrs. Mitchell mention the name "Sheehan," before she knew its significance; and that Mrs. Mitchell had said her father's name was "Thomas." Her belief that Thomas Sheehan was her father was first suggested by the story published in the Commercial Gazette. She remained in New Castle from 1865 until in December, 1887, when she came to live with Mrs. Sheehan. For several years prior to her coming here she had been sewing in a tailoring establishment.

This is substantially the story of Miss Mitchell as told by her in court, under objection as to competency. It was corroborated to some extent by a statement which was made to Mr. D. B. Kurtz, a leading attorney of New Castle, in 1881, before she suspected that Thomas Sheehan was her father. Mr. Kurtz jotted down notes, at the time, which he produced at the present hearing. These notes do not show, and Mr. Kurtz has no recollection independently of them, that she said anything about having lived in a family of the name of Gibbons, of which there was an old man by the name of Daddy Gibbons, or in reference to the payment of any money to, or even the use of the name Garrett, or of the existence of a birthmark; but with these important exceptions, the statement is substantially like that now given, with this additional item that she had not recognized the "smaller man" who accompanied Harrison.

While Mrs. Mitchell was visiting her relatives in 1865, she said, in answer to an inquiry in reference to the parentage of Julia, "I guess she is the market woman's daughter." Why she guessed so does not appear. Both she and her husband died before Thomas Sheehan, and neither they nor their rela-

Adjudication.

tives seemed to have given Julia any information, if any they had, which would enable her to find her parents.

The evidence shows that Miss Mitchell has a birthmark of the character and in the location described by Mrs. Sheehan; and numerous witnesses declare that she bears a striking resemblance in person, movement and disposition to Thomas Sheehan. Other witnesses declared just as emphatically that there was no resemblance whatever, and some who had known Sheehan's child while in this county were positive that her features differed radically in style from those of the present claimant. The personal appearance of claimant is of that strongly marked Celtic type so frequently seen here. A photograph of a large group, in which was said to be a likeness of Sheehan, was produced in court for the purpose of comparison; but the figures were so small and dim that Sheehan's could not be distinguished even with the aid of a hand-glass of strong magnifying power: and it was thereupon agreed by counsel that the photograph should be placed in the hands of a photographer for development, and the result reported to court. The result has not proved satisfactory, and counsel for the collateral relatives object to the admission of the enlarged copy, but consent that the original shall be filed in evidence.

It will be seen from the foregoing that the evidence upon which Miss Mitchell relies to sustain her claim of identity is purely circumstantial. On the other hand, the evidence adduced by the collateral relatives is mainly positive and direct. Their principal witness was Garrett Gibbons, in whose family Sheehan's child was placed. He arrived here from Illinois while the hearing was in progress, and was sworn without the usual preliminary examination by counsel. It is important to note that he was a man of small stature. He was unlettered, and apparently of less than ordinary ability. While his memory was at fault as to time, his story was consistent as to the order and place of events, and was rather strengthened by a rigid cross-examination. His account of the circumstances under which Sheehan's child was placed in Mrs. Gibbons' custody, was substantially like that given by Mrs. Sheehan. But he positively denied that there was any birthmark on the child; and in this he was corroborated by Amelia Corbett, who twice bathed her while living in this county. The child was baptized

### Adjudication.

as Mary Sheehan at Saltsburg, and was always spoken of in the family as Mary, and never as Julia. When he left for Keokuk, his family consisted, as already stated, of his father, wife, son, sister, and Mary Sheehan. His brother Mike had preceded him. He went by boat, visited friends in St. Louis on the way, and settled in Keokuk, Iowa. He occupied at first rooms in the same building with his brother Mike, who was married and had one son Mike, where he remained probably until the spring of 1858, when he moved across the river to Hamilton, Illinois; and there Mary Sheehan, Mrs. Gibbons and her infant daughter died, and were buried in the Catholic graveyard at Keokuk. This graveyard had probably not been formally consecrated at the time, for Gibbons states that "it was no burying ground; that was the time they commenced burying people in it; and it was called a burying ground." Upon the death of Mrs. Gibbons, the household seems to have been broken up. Gibbons took his son Mike to St. Louis, where he placed him in an orphans' asylum; and on his return shortly afterward (say 1860) learned that his father had been dead two months. He then crossed over to Illinois; and after working at several places, finally settled in Jacksonville in 1865, where he had since remained earning his livelihood as a common laborer. He had not seen Thomas Sheehan since he left Pittsburgh. He had not seen his son Mike, from the time he had placed him in the asylum at St. Louis until he met him here during the present hearing; but had heard that Sheehan had taken him out of the asylum, and he was afterward content. He stated that there were parties still living in Keokuk who were present at the death of Mary Sheehan; and gave the names of some of them. He declared that he had never seen Miss Mitchell until the present hearing, and had never been in Leavenworth.

In rebuttal, Miss Mitchell testified that Garrett Gibbons was the smaller man whom she had seen with Mr. Harrison.

Counsel for both parties having announced the close of the testimony, the court called their attention to the absence of evidence from Keokuk, and suggested that at least the depositions of the parties whom Garrett Gibbons had named as having been present at Mary Sheehan's death and burial should be taken. They decline to do so; and thereupon the court, in the interest of justice, ordered that such depositions should be

Adjudication.

taken, and continued the hearing for that purpose. The court had less hesitation in making the order, because no effort appeared to have previously been made to obtain evidence at Keokuk.

While the evidence taken in pursuance of this order does not throw much additional light on the question involved, it is on the whole, when analyzed, corroboratory of the evidence of Garrett Gibbons. Gibbons had not been in Keokuk for twelve years; and some of the witnesses whom he mentioned as having been present at the death or burial of Mary Sheehan were dead; the memory of others was unaccountably faulty. The evidence shows the arrival of the Gibbons family, of which Mary Sheehan was a member, in Keokuk, and of its removal some months after to Hamilton, Ill., where a child died September 1, 1858, and Mrs. Gibbons died April, 1859. There is no record in the Catholic Church of Keokuk of the death or burial of Mrs. Gibbons; the family had become paupers, and she was probably buried in "common ground" connected with the Catholic graveyard, and no record kept. The record, however, shows the burial September 1, 1858, "A child of G. Gibbons, age 1 year and ½;" and December 24, 1860, "Michael Gibbons, 57 years." It is contended that this child could not have been Mary Sheehan. But it must be remembered that Mr. and Mrs. Gibbons had left Pittsburgh in the fall of 1857 with only one child of their own; that the evidence does not show the birth of another prior to their settlement in Hamilton; and that consequently it was a physical impossibility they should have another child "age 1 year and ½" on September 1, 1858. It will be noticed that the church record does not give the first name of the child buried; the inference is that inquiry was not made of the family for it; but, as she had been made part of the Gibbons family, and was very small considering her age, it was assumed she was the child of Garrett Gibbons, and younger than she really was, and the entry was made accordingly. Garrett Gibbons stated that his wife had given birth to a daughter in Hamilton, who died when only a few weeks old; some of the Keokuk witnesses had heard of the death of a baby; but it is improbable the record referred to this child. Michael, the son of Garrett Gibbons, is known to be still living. Mary Sheehan was therefore the only other

Opinion of Court below.

child in the family of Garrett Gibbons, and was in all probability the child to whom the church record referred.

It will be seen from the foregoing résumé that the principal questions submitted for the decision of this court are of fact.

In deciding these questions, this principle must be kept in view, that the burden of proof was on the claimant to show affirmatively that she was the child of Thomas Sheehan, deceased, as a basis of her right to his estate; that she was bound not only to make out a prima facie case, but to sustain it by the weight of evidence when attacked. Has she done this? A careful analysis of the evidence will show that she has not.

The case presented by this claimant turned mainly upon the credibility (a) of her "earliest recollections;" (b) of the evidence of Mrs. Sheehan in reference to the existence of a birthmark on Sheehan's child similar in location and character to that on claimant's person; and (c) of claimant's resemblance to Sheehan. This evidence will be examined and weighed in connection with that adduced in denial.

—After considering the weight to be given to the early recollections of the claimant; the corroboration thereof, as claimed, by the testimony of Mr. Kurtz; the market-house incident; the recognition of the claimant by Mrs. Sheehan; the importance to be attached to the existence of the birthmark, and the question of family resemblance, the court proceeded:

Thus far the case has been discussed without reference to the direct and positive evidence of the death of Mary Sheehan which was adduced; and the claimant cannot be confidently said to have made out such a case as satisfies the court that she is entitled to this estate as only child of Thomas Sheehan, deceased. To say the least, the question is in doubt. But, when the direct and positive evidence adduced on behalf of the collateral relatives has been thrown into the balance, the weight greatly preponderates against her.

It was urged on her behalf, that Garrett Gibbons, the principal witness against her, should be discredited because of his manifest bias and inconsistency. The answer to this is that, while he is indirectly interested through his son, this claimant was the principal witness in her own behalf and therefore directly interested; and that consequently upon this ground he

is entitled to more credit.  The story of Garrett Gibbons was consistent as to the main fact of the death of Mary Sheehan, and was corroborated by surrounding circumstances.  It was faulty only in respect of lapse of time, and this is attributable to his lack of education. · His story was told in a simple and straightforward manner and did not suffer in comparison with that of this claimant.

These suggestions are sufficient to show that Miss Mitchell has failed to sustain her claim to share in Thomas Sheehan's estate.  The fatal defect in her case is, that she has not supplied the link which is necessary to identify her with the Mary Sheehan who was placed in charge of Mrs. Gibbons.  If the direct and positive evidence which was adduced in contradiction of her claim be true, it is impossible she can be Mary Sheehan.  Even if her claim were in doubt, upon the evidence adduced here, she could not prevail as against the collateral relatives whose relationship to Sheehan is admitted; she must have shown by the weight of evidence that she was entitled to Sheehan's estate as only child.

This court, therefore, finds upon the evidence adduced:

1. That Ann Sheehan is the widow of this decedent, Thomas Sheehan.

2. That Julia Mitchell has failed to sustain her claim to share in the estate of said decedent; and

3. That said estate must be distributed among the said widow, Ann Sheehan, and the collateral relatives of said decedent.

A decree having been entered, the claimant filed various exceptions.  After argument thereof before the court in banc, the exceptions were dismissed and a final order made distributing the fund in accordance with the foregoing findings.  Thereupon the claimant took this appeal, specifying that the court erred:

1. In finding that the claimant had failed to sustain her claim to share in the estate of the deceased.

2. In finding that the estate must be distributed among the widow and the collateral heirs of said decedent.

*Mr. Thos. C. Lazear* (with him *Mr. C. P. Orr* and *Mr. W. F. Wise*), for the appellant.

Opinion of the Court.

As to the admissibility of previous declarations of a witness, ante litem motam, to support the testimony as to the birth-mark, counsel cited: Henderson v. Jones, 10 S. & R. 322; Craig v. Craig, 5 R. 91; F. & M. Bank v. Boraef, 1 R. 152; McKee v. Jones, 6 Pa. 425; Hester v. Commonwealth, 85 Pa. 139; Myre v. Ludwig, 1 Pa. 47. That evidence of this kind has always been held competent to prove identity: Miller v. Belmonti, 11 Rob. (La.) 339; * Gray v. Commonwealth, 101 Pa. 384; Brown v. Schock, 77 Pa. 471.

*Mr. N. S. Williams* (with him *Mr. G. W. Williams* and *Mr. J. M. Shields*), for the appellees.

OPINION, MR. CHIEF JUSTICE PAXSON:

This record presents a single question of fact. It is one of identity. Upon the distribution of the estate of Thomas Shee-han, deceased, the appellant presented herself before the audit-ing judge, and claimed to be the daughter of the intestate. Her story is an interesting and somewhat remarkable one, but it is so thoroughly detailed by the learned president of the Orphans' Court that I will not stop now to repeat it. Nor is any extended discussion of the evidence deemed necessary, as we fully agree with the conclusion arrived at by the court below.

Under the peculiar circumstances, the question of identity was one which would have justified an issue. As none was de-manded, and the parties preferred the decision of the court upon the facts, rather than the verdict of a jury, we must give the finding of the court the same effect as a verdict. The evi-dence in the case covers several hundred printed pages, and is carefully and intelligently discussed by the learned judge be-low. Were we to reverse his finding of fact, it would be nec-essary to review it. Some brief comments of a general nature are all that I desire to add to what he has said.

Under all our decisions, if the evidence before the Orphans' Court was sufficient to submit to a jury and sustain a verdict, we will not disturb the findings of the learned judge below. A pointed illustration of the wisdom of this rule occurs in this

---

* Counsel referred to an interesting account of this case, by Geo. W. Cable, in the Century for May, 1889.

Opinion of the Court.

case. The appellant, who claims to be Mary Sheehan, depends entirely upon circumstantial evidence of a number of independent facts, each unimportant if standing alone, and some of them, at least, not competent evidence if disconnected; yet, when connected and bound together like the familiar bundle of sticks, it is claimed they lead the mind to the conclusion that the appellant is the real Mary Sheehan. On the other hand, if Garrett Gibbons tells the truth, the appellant has no case. If not an imposter, she is at least mistaken, and the real Mary Sheehan has been in her grave for over thirty years. Garrett Gibbons could not well be mistaken as to Mary Sheehan's death. If his story is not true, he has told a deliberate falsehood. There is no middle ground. It is impossible to sustain appellant's case without discarding the testimony of this witness as false. The learned judge below saw this witness face to face. He was on the stand for one or two days, and underwent a lengthy cross-examination. The learned judge below believed he was telling the truth. The manner of the witness, when on the stand, may have had great weight in disposing of the question of credibility. Nay, more, it may have controlled it, and properly so. Now, we are practically asked, as an appellate court, to reverse the learned judge below upon this particular finding, and to say that he was wrong in crediting Garrett Gibbons, with nothing to guide us but the testimony of the witness as it appears in type. There is nothing in his story that is inherently improbable. The learned judge below says, in regard to his testimony: "The story of Garrett Gibbons was consistent as to the main fact of the death of Mary Sheehan, and was corroborated by surrounding circumstances. It was faulty only in respect of lapse of time, and this is attributable to his lack of education. His story was told in a simple and straight-forward manner, and did not suffer in comparison with that of this claimant."

I have read over every word of this testimony with great care, some of it several times, and am clearly of opinion that the claimant's evidence, standing alone, presents a weak and inconclusive case. Without going into detail, it rests upon three grounds, viz.: (a) Early recollections of the claimant; (b) family resemblance, and (c) a birthmark.

· As to the first branch, it may be said that the only recollections which even remotely connect her with the Sheehans were

those in regard to the family of Garrett Gibbons. At that time she was between four and five years old, and the circumstances are detailed thirty years afterwards. But little weight can be attached to such recollections. Even if true, they may be the result of a coincidence; and it is a singular circumstance that in her recollections as detailed to her counsel, D. B. Kurtz, Esq., in 1881, she makes no mention, so far as we know, of Garrett Gibbons or his family. In that statement there is not one word to connect her with Thomas Sheehan. Nor does the market-house incident possess any real significance. There is no evidence that Mrs. Mitchell ever said that the appellant was the daughter of Thomas Sheehan, or that she had any knowledge upon that subject. It is extremely improbable that she had such knowledge. The alleged resemblance of the appellant to Sheehan is a circumstance, but a very weak one. The evidence is conflicting upon this point. But, granting the likeness, it may be the result of the merest chance. We all know that striking likenesses often occur between persons who are not of the same blood; so strong that in many instances the one is mistaken for the other. The birthmark is certainly the strongest feature of appellant's case. As regards this, however, there is a conflict of testimony. It rests principally upon that of Mrs. Sheehan, which is seriously impeached upon this very point. If all she says is true, it makes a coincidence, and a striking one; but it is not sufficient, standing alone, or in connection with the other facts in the case, to establish the claim of the appellant to share in the distribution of the estate of Thomas Sheehan as his heir at law. It must be remembered that the burden of proof is upon her, and her claim should be established by satisfactory evidence. I attach little weight to the fact that Mrs. Sheehan acknowledged the appellant as her child. The latter was taken from her when only nine days old; she did not see her again for about thirty years; and in the yearning desire of a mother to find her child, I can understand why she should be influenced by weak and inconclusive evidence. The books are full of cases where mothers have been thus misled. We do not say the appellant is not the child of Thomas Sheehan; we only say the evidence is not strong enough to justify us in saying that she is.

The decree is affirmed, and the appeal dismissed, at the costs of the appellant.