## Kates's Estate.    Kates's Appeal.

*Legitimacy—Evidence—Question of fact—Finding of Orphans' Court.*

Petitioner's claim to be considered a legitimate son of decedent having been rejected by the orphans' court, on the ground that the claim was not sustained by the evidence, this finding of the court would not be overruled by the Supreme Court, except for clear error.

The orphans' court having found as a fact that petitioner had failed to make out his claim to be a son and heir of decedent, and no error having been assigned to such finding, the Supreme Court will not overrule the finding.

*Jurisdiction of Orphans' Court—Power to direct an issue—Act of March 29, 1832, section 55, P. L. 208.*

The act of March 29, 1832, section 55, P. L. 208, confers upon the orphans' court the power of a chancellor to direct an issue for the determination by a jury of a particular question of fact as to which he is in doubt. As in the case of a chancellor, the exercise of this power is discretionary with the court, which is not bound to accept the verdict of the jury and therefore is not bound to direct the issue.

The granting or awarding of the issue being within the discretion of the court, the action of the court is not reviewable except on the ground of abuse of discretion.

*Partition—Right to an inquest—Legitimacy.*

The right to demand an inquest in partition depends upon the standing of petitioner as heir of the decedent, and the orphans' court having decided that petitioner's claim to be regarded as such heir was not sustained by the evidence, his prayer for an inquest was properly refused.

Argued Jan. 27, 1892.    Appeal, No. 103, July T., 1891, by petitioner, Theodore N. Kates, from decree of O. C., Phila. Co., Jan. T., 1886, No. 305, dismissing petitions filed in the estate of William Kates, deceased.    Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCHELL and HEYDRICK, JJ.

Petitions praying for an inquest in partition and for an issue to the common pleas to try the question of fact whether or not petitioner is a son of William Kates and Eliza Jane Kates, deceased.

The facts appear by the opinion of the court below, ASH-MAN, J., which was as follows:

" In this case two petitions, the one for partition and the other for an issue to determine a question of fact set up in the former petition, were presented. In his prayer for partition, Theodore N. Kates alleged that he was a son of the decedent; an allegation which the respondents denied. The claimant testified that he was born on January 28, 1827, in New Jersey, of William Kates and Eliza Jane Thompson, and a few weeks after his birth was placed by his mother in the family of Joel Holman and wife, and remained with him until he was sixteen years of age. Two months after his birth, his parents, he says, were married in Philadelphia, where they always afterwards resided, the putative father dying in 1868, forty-one years after that event, and the alleged mother in 1882, fifty-five years after. Joel Holman and his wife died many years ago. The claimant saw his mother, he says, two or three times a year at his adopted home in New Jersey, where she brought him clothing and paid his board. He also saw her at her house in Arch street, Philadelphia. Here he was enjoined, he says, by his mother, not to disclose his identity for the reason that it would disgrace her, and he accordingly gave his name as Holman, and disguised his visits under a pretence of selling market produce. At ten years of age he first saw his father, in the store of the latter, whither he was taken by Mr. Holman, and he was here forbidden to address the decedent as father in the hearing of others. When he reached the age of twenty-one he called on his parents and was presented by them with a gold watch. Some years after that he met his father on the street, and was given $100 to enable him to buy the house in which the Holmans lived, and in 1862, when he was thirty-five years old, he again met his father on the street, and was given $200 with which to pay off a mortgage on the house. Several years later, he encountered his father on Market street, and in an interview lasting a few minutes, in which he urged that something should be done for him, his father promised to give him $10,000 on the following Saturday, at a designated place and hour. The father did not, however, appear, and did not pay the money. He was soon afterwards confined to his house by illness, and, although he lived some years longer, he was never

again seen by the claimant. The mother survived the father fourteen years, and the claimant saw her for the last time about two years before she died. Neither she nor the claimant had ever divulged to the children who were born of the marriage their alleged kinship to the claimant.

" The autobiography was admitted as evidence under a rule of law which allows a party in interest to testify on his own behalf where a question of pedigree is in dispute. It embodied all the facts bearing in any way upon the most vital point in his history—his parentage—which a man who was unusually shrewd could gather from the incidents and memories of a lifetime. It was delayed until the claimant had reached the age of sixty-four years, and until only two months remained before the statute of limitations would have forever barred his claim. It was, moreover, not only the corner stone of his case, but its entire framework; without it there would have been no edifice and no case. Outside of what came from his own mouth, there was absolutely nothing in the history and proofs to connect him in any way with the decedent. Not a line nor a word, nor even a memento was produced which had proceeded from William Kates, and which, even by the subtlest play of the imagination, could be tortured into a recognition of the claimant's sonship. This circumstance is significant, because, when the statement was produced, the alleged parents and the guardians to whom they were said to have committed the claimant, and indeed every person who in 1827 was old enough to have an intelligent knowledge of his relations, had passed away. That the narrative, to serve as the basis of a judicial decree, shall be free from contradictions, is manifest, not only from these considerations, but from the added one that the few facts which it details, if they happened at all, were of a character to so fasten themselves upon the memory that they could have been related in but one way. The fatal defect in the story is that the one incident, which, if true, would have shown that ties of some sort, and very close ones, existed between the decedent and the claimant, was so narrated by the witness as to be wholly unworthy of belief. We allude to the interview in which the decedent was said to have promised $10,000 to the claimant. The remainder of his narrative calls for no comment. His testimony as to his birth was hearsay; his alleged visit when

a child to decedent's shop did not prove that the decedent was his father; and the gifts of a watch and of money rested on his own assertion, and might as well have been of any other article and in any other sums. It is true that the claimant produced a watch and also a mortgage; but in this pantomime he was only rehearsing the part of a Falstaff, when that hero, in proof of his combat with the robbers, produces a sword. The interview, which, if not fictitious, must have been a momentous one to the claimant, was casual so far as the decedent was concerned; it took place on the street, and it lasted not longer than ten minutes. The reason assigned by the claimant for demanding assistance was sufficiently cogent to induce the decedent, who was described as so penurious that his children were forced to beg their pocket-money from their uncle, and whose holdings were chiefly real estate, to promise to bring $10,000 to the claimant on the next Saturday, and this, too, although the claimant had not asked for that nor any other specified amount. The reason which thus touched the heart of the decedent and unlocked his pocket-book at the same moment, we are assured by the claimant, was the marriage of the latter. That event, however, had taken place ten years before; and a marriage so ancient was an unwieldy subject for the pathetic, even when embellished with the dramatic skill of the claimant himself. But he rose with the occasion, and with the aid of the license which is sometimes accorded to a novelist, he transposed the nuptials from the past to the future, and he told his alleged parent that he was 'going to be married.' To this the decedent replied: 'What in the world do you want to get married for?' Unfortunately for the unities of the plot, it appeared from the testimony, both of the claimant and of his wife, that the latter, some time before this conversation, had, as they asserted, written to the decedent, informing him that she had been married to his son eight years. When this fact was recalled to the claimant, on cross-examination, he said: 'Perhaps I told him I was married.' But this reply only lifted him from one horn of the dilemma to impale him on the other. If he really told the decedent that he was about to be married, the decedent would have answered that his wife had declared that he was married already; and if he really said that he was married, the answer could not possibly have been, ' What in

the world do you want to get married for ? '   The claimant has
given to this conversation, which is the central fact of his case,
two versions, each of which cuts the throat of the other.   If a
conversation took place at all, it could not have been what he
has said it was.   But if we dare not believe in the conversa-
tion, how can we believe in the promise which formed part of
it ?   It is easier to believe that the promise to give the money
was made than it is to believe that, if made, the claimant would
not have asked for its fulfillment.   Yet he confessed that he
did not, although the decedent lived for several years there-
after.   Naturally the claimant was anxious to account for his
inaction, and he sagaciously put it on the sole ground which
would secure him a hearing, when he said that he waited out
of regard for the feelings of his mother.   His sensibilities were
not shocked, however, when his wife, with his knowledge, and
because, as he stated, 'he thought it was time something should
be done,' made it her business to divulge, as she asserts, to his
aunts, the whole story of his mother's shame.   He afterwards
resolved to call upon the aunts himself.   He gave no reason
for the visit, and he could not well give one, because he ad-
mitted that he knew before he started on the errand that both
of the ladies were dead.   But he made the visit notwithstand-
ing, and he learned, either from the dead or the living, that his
mother had also died.   He then hastened to his alleged broth-
ers and sister, made known to them his relationship, and offered
to settle for a sum which was elastic enough to expand in pro-
portion to the number of his visits.

"Passing from his individual testimony we find two wit-
nesses who were faithful to his interests in Nathan Holman,
the son of the person with whom he had been placed in his in-
fancy, and Amelia Holman, the wife of the witness.   The for-
mer was seventy-three years of age when he appeared at the
hearing, and he was able to swear that in 1827, and therefore
when he was only eleven years old, to the fact, so apt to be
within the knowledge of a child of that age, that Mrs. Kates
paid the board of the claimant to Holman's parents, and that
she cautioned the witness at a time when her daughter Catha-
rine was three years old, not to tell the child that claimant
was her brother.   He also declared that a certain Tom Bur-
kitt once took him to the shop of the decedent.   When Tom

Burkitt was called he testified to the visit, but he could not tell why he made it, nor what took place at the interview. He was careful to add, that he *supposed* the decedent asked about the boy. Nathan Holman, in his interview with Catharine, though he did not venture to say so when testifying, also detailed a conversation between himself and the decedent, in which the latter was made to go beyond the offer which he was said to have before made to the claimant. According to the witness, the decedent expressed an intention to give a farm to the claimant which should cost $20,000, and to stock it besides; and he directed Holman to look up such a property. The witness was asked: 'Did you do it?' and he answered, 'No, we looked around for quite a while, and did not see anything that exactly suited; and then we did not look any more.' The person on whose behalf this munificent offer was made, and by whom it was so jauntily dismissed, was living at the time on a farm which, he says, cost $400. Nathan Holman, Amelia Holman and the wife of the claimant all testified to a visit which they declared the wife of the decedent, accompanied by her daughter Catharine, once made them at Mount Holly. They diverged somewhat as to its date; Amelia fixing it about 1845, Nathan at 1850, and the claimant's wife at 1857. The last-named witness, however, was sure as to the time, because her first child was then three years old. She also recalled it by the circumstance that Catharine was eating peaches, and did not know what to do with the peach stones. Yet this person, who was so youthful that she had not learned how to eat a peach, was at that very time at least twenty-eight years of age. Catharine was placed on the stand, and denied that she had ever been to Mount Holly, and that she had ever heard or known that her mother had seen the place.

" Very little else appears in the case. Some testimony was offered to show that the claimant bore a strong personal resemblance to the decedent. Of course, this could weigh only in the event that other evidence established the existence of relations between those parties. Estates are not given away and reputations imperiled upon the strength of a casual coincidence. Mr. Pugh testified that fifty-three years before, when he was an apprentice boy, he had overheard Mr. Kates speak of having married a woman and cared for a boy, or of having

taken care of a woman and cared for her boy. His method of fixing the time of this conversation was as singularly unfortunate as his remembrance of its terms. He said he was able to hear what was said, although in another room from that of the speakers, because the doors and windows were open by reason of the heat of the weather. When reminded that he had described the season as winter, he revised his theory of the heat by explaining that it arose from the fumes of the vitriol which was used in the establishment. Several cousins of the Kateses testified to a family tradition that the decedent was never married at all, which was manifestly false, and others to a tradition that there was somewhere an illegitimate son. There was also record evidence that the decedent, at different times, had given bonds to the guardians of the poor for the support of more than one illegitimate child. One of these, dated as far back as 1819, described the mother as Eliza Thompson, and it was argued that she must have been the woman who became his wife in 1827 under the name of Eliza Jane Thompson, and who married him three months after her second illegitimate child was born, and had a third child in the first year of her married life.

" The case stands then in this shape : Ever since the passage of the act of 1857, and its supplement of 1858, the lifetime of of a generation, the claimant, if the allegations respecting his parentage are true, has been in a position to vindicate himself before the law. His father has been dead twenty-three years and his mother nine years, and the mother's death threw down the last obstacle which a regard for her peace of mind might have raised to the enforcement of his rights. We have seen how far a solicitude for her welfare animated him in her lifetime, but we are dealing with him in the attitude which he has now assumed. With some tactical skill he has chosen his ground where, as he believed, no enemy could confront him. His alleged parents and the guardians to whom he declares they confided him are dead ; and with them disappeared the only witnesses who could directly affirm or deny the truthfulness of his own testimony. Even with this vantage he seems to have required the spur of the statute to set him in action. He has allowed a family, of which he claims to be a member, to remain in ignorance of his title, and to adjust their affairs

upon the theory of an undivided ownership of property in which he now claims an interest. When his own declarations are eliminated from the record, the few shreds of evidence which remain make up no greater inventory than this : that a tradition was extant in one branch of the family to which he claims to belong, that one member of another branch was illegitimate, and that this had enlarged into a tradition which bastardized all the issue of that branch; that the claimant bore a strong resemblance to the decedent; that the decedent had been seen by two witnesses, and, as one of them conjectured, had asked about the claimant; that he had once been heard to say that he had cared for or married a woman and had cared for a boy; and that he had given more than one bastardy bond to the guardians of the poor. It is hard to believe that if the claimant regarded the rehabilitation of his rights as a thing of any moral worth, he would have been so tardy in asserting them; its commercial value he fixed himself in his proposal to compromise with the heirs of the decedent, and in that estimate lies the only assignable motive which appears to have swayed him.

"In passing upon the merits of this case we have assumed in advance the fact of jurisdiction. The power of the Orphans' Court to decree partition of the lands of decedents is statutory, and has been gradually enlarged by successive legislatures; and that court is not subject to the rule which in a court purely of equity must prevail, that disputed legal rights are determinable only at law: (Washburn's Appeal, 105 Pa. 480; Ferguson's Appeal, 117 Pa. 426.) In exercising its statutory functions, it has inherent power to pass upon the status of the parties who invoke its jurisdiction; and hence, in Welch's Appeal, (126 Pa. 297,) where the respondent set up an adverse possession in himself, 'denying thereby the tenancy in common, the court held the testimony of the exceptant insufficient, and confirmed the inquest.

"In the present case the tenancy in common was not disputed, and the petitioner did not hold adversely because he had never been in possession at all; the single question was whether he was an heir. Our authority to resolve that question was necessary to a proper disposal of matters over which jurisdiction had been expressly conferred by statute. (Lowry's

Appeal, 114 Pa. 219.)   On the ground of laches alone many
authorities would sustain us in dismissing the petition at the
outset.   The claimant, however, has been allowed full sway in
asserting his rights.   Having slept upon his claim until the
statute of limitations was about to extinguish it, he should at
least have satisfied us beyond a reasonable doubt that his pre-
tensions were well founded.   He has failed in the effort; and
we are forced to find from the evidence that he has not estab-
lished his claim to be the son of the decedent.   We also are
of opinion that even if, upon that evidence, a verdict in his
favor should be rendered by a jury, it would be set aside.

" We therefore dismiss both petitions."

A motion for a reargument having been made was refused
by the court, FERGUSON, J., dissenting.   (See 48 Leg. Int.
196, 28 W. N. 241.)   After some further discussion of the
facts, the opinion of the court (ASHMAN, J.) concludes as fol-
lows :

" The only case in which an issue seems demandable as of
right occurs under the act of June 16, 1836, relating to the
distribution of the proceeds of sheriff's sales, which required
the court, where a fact was in dispute, to award an issue at the
request of any person interested.   Even under that statute it
has been repeatedly held that a mere allegation without evi-
dence, or against the evidence, or where the record shows that
a trial would avail nothing, would not entitle the party to the
process.   (Knight's Appeal, 19 Pa. 493 ; Dickerson & Haven's
Appeal, 7 Pa. 255; Benson's Appeal, 48 Pa. 160; Martin's
Appeal, 97 Pa. 85.)   The supplementary act of April 20, 1846,
provides that before an issue shall be directed upon the distri-
bution of money arising from sales under execution or orphans'
court sales, the applicant must make affidavit that there are
material facts in dispute therein, 'upon which affidavit the
court shall determine whether such issue shall be granted.'   The
language of the act of March 15, 1832, sec. 41 (Pur. 1476), de-
claring that whenever a question upon a matter of fact arises
respecting the validity of a will the court shall direct a precept
for an issue to the court of common pleas, is mandatory ; yet an
issue will not be granted if upon the evidence a verdict against
the will would not be sustained.   (Wainwright's Appeal, 89
Pa. 220.)   The pending question is raised in partition proceed-

ings, where this court, by the act of March 29, 1832, has full power to make partition and 'to give judgment that the partition thereby made be firm and stable forever;' a power which of necessity included the right to dispose of all matters which come within the jurisdiction thus expressly conferred (Lowry's Appeal, 114 Pa. 219), and which was exercised in a case in no wise different in principle from the present. (Welch's Appeal, 126 Pa. 297.) What follows by implication from this statute was however expressly conferred by section 55 of the same act, which provided that the court 'shall have power to send an issue to the court of common pleas of the same county for the trial of facts by a jury, whenever they shall deem it expedient so to do.' Behind the discretion which is thus broadly bestowed is the power, without which it would amount to nothing, to determine those facts in their own forum, and through their own forms. No constitutional right of the petitioner was impinged upon; he waived his action of ejectment in a court of common law, for the speedier process of this court, with the knowledge that the judgment of either was equally final. It would be an idle formality to discuss a question which was long ago put at rest—the question of constitutional rights. The 'due course of law,' by which, under the constitution, the property of a party is alone to be taken or preserved, is process according to the law of the land, to which, except in regular common law proceedings, a trial by jury is not necessarily incident. (Reagh v. Spann, 3 Stew. (Ala.) 108; Walker v. Sauvinet, 92 U. S. 90.) Hence it was held in Church v. Kelsey (7 Sup. Ct. Reporter, 897) that that clause in the fourteenth amendment does not prevent a state from giving to a court of equity jurisdiction of a suit brought by the owner of an equitable interest in land, to establish his rights against the holder of the legal title, although it deprives the latter of the right to a jury trial, which he would have in a suit at law.

" We have gone into this detail because, while we are agreed upon the question of law as to our jurisdiction, we are not unanimous as to the force of some of the testimony.

" The motion for a reargument is refused."

Petitioner appealed.

*Errors assigned* were (1, 2, 5) refusing an issue; (3, 4, 6) refusing the prayer for an inquest to make partition of the real estate of decedent.

*Mayer Sulzberger, F. S. Phillips* and *Samuel M. Hyneman* with him, for appellant.

*John G. Johnson*, for appellees.

PER CURIAM, April 18, 1892:

The first specification alleges that the court below erred in refusing to send their precept to the court of common pleas of Phila. county to try before the jury the following question of fact: "Whether Theodore N. Kates is or is not the son of William and Eliza Jane Kates." The second and fifth specifications raise the same question.

The 55th section of the act of March 29, 1832, P. L. 208, provides as follows:

"The orphans' court shall have power to send an issue to the court of common pleas of the same county, for the trial of facts by a jury, whenever they shall deem it expedient to do so." This act merely confers upon the orphans' court the power which had been exercised by a chancellor to direct an issue to the common pleas to determine a particular question of fact as to which he felt a doubt. The verdict of a jury in such case was for the purpose of enlightening his conscience as to the fact in question. He was not bound to accept the verdict of the jury; on the contrary, he might reject it, unless satisfied that it was right. It has never been held that a chancellor was bound to send such issue to a jury, unless he deemed it essential to a proper disposition of the case. In other words, it was a matter of discretion. The same rule applies to the orphans' court under the act of assembly above cited. Sheehan's Est., 139 Pa. 168, does not decide that the orphans' court is bound to send an issue to a jury whenever requested. It is true, we said that, under the peculiar circumstances of that case, the question of identity was one which would have justified an issue. No issue was demanded, however, as the parties preferred the decision of the court upon the facts. In the case in hand there was a demand for an issue, which was refused. We cannot say this was error. It was a matter within the discretion of the court.

The third, fourth and sixth specifications allege that the court below erred in refusing the appellant's demand for an inquest to make partition of the real estate of William Kates, deceased.

As the appellant had failed to establish his claim to be a son and heir of William Kates, it is manifest he had no standing to apply for an inquest to make partition of the real estate of said deceased. The court below distinctly found that appellant's claim to be the son of William and Eliza Jane Kates was not sustained by the evidence, and this finding is not assigned as error. Had it been specifically assigned, it would not have availed the appellant. We would not overrule the finding of the court below upon a question of fact, except for clear error. We cannot say that any such error exists in this case. The testimony of the appellant was too vague and inconclusive to establish his right to a dead man's estate, especially in view of the great delay in asserting such right.

The decree is affirmed, and the appeal dismissed at the costs of the appellant.